STEVE W. BERMAN (*pro hac vice* pending)
ASHLEY A. BEDE (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
*steve@hbsslaw.com*
*ashleyb@hbsslaw.com*

ELAINE T. BYSZEWSKI (SBN 222304)
CHRISTOPHER R. PITOUN (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152
*elaine@hbsslaw.com*
*christopherp@hbsslaw.com*

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CHRISTINA WIRTH and ADAM WAGNER, on behalf of themselves and all others similarly situated,<br><br>                                   Plaintiffs,<br><br>        v.<br><br>MARS, INC., a Delaware corporation; MARS PETCARE US, INC., a Delaware corporation; IAMS COMPANY, an Ohio corporation; PROCTER & GAMBLE, CO., an Ohio corporation,<br><br>                                   Defendants. | No.  8:15-cv-1470<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATION OF CALIFORNIA CONSUMER PROTECTION LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.     OVERVIEW ........................................................................... 1

II.    PARTIES .............................................................................. 5

III.   JURISDICTION AND VENUE................................................ 7

IV.   FACTUAL ALLEGATIONS ................................................... 7

      A.    Forced Labor Is Used to Produce Iams Cat Food. .................................. 7

      B.    Defendants Fail to Disclose the Use of Slave Labor in Their Supply Chain. ................................................................... 12

      C.    Defendants Recognize that the Use of Slave Labor in Their Supply Chains Is Wrong....................................... 15

      D.    Use of Slave Labor in the Iams Supply Chain Is Material to Consumers. ................................................. 20

V.    CLASS ACTION ALLEGATIONS................................... 22

VI.   CAUSES OF ACTION ..................................................... 24

FIRST CAUSE OF ACTION  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ... 24

SECOND CAUSE OF ACTION  VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT  (CAL. CIV. CODE § 1750, *ET SEQ.*) ............................. 26

THIRD CAUSE OF ACTION  VIOLATIONS OF THE FALSE ADVERTSING LAW  (CAL. BUS. & PROF CODE §§ 17500, *ET SEQ.*) ............................... 28

JURY TRIAL DEMAND ......................................................... 30

Plaintiffs CHRISTINA WIRTH  and ADAM WAGNER ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Mars, Inc., Mars Petcare US Inc., the Iams Company ("Mars"), and Proctor and Gamble Company ("P&G"), (collectively "Defendants").  Plaintiffs' allegations against Defendants are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## I.      OVERVIEW

1.      America's largest and most profitable food conglomerates should not tolerate slave labor anywhere in their supply chains.  These companies should not turn a blind eye to known human rights abuses or shirk from investigating potential human rights abuses by their suppliers, especially when the companies consistently and affirmatively represent that they act in a socially and ethically responsible manner.  When these food conglomerates fail to uphold their responsibility for ensuring the absence of slave labor in their supply chains, their misconduct has the profound consequence of supporting and encouraging slave labor.  And when these food conglomerates fail to disclose the use of slave labor in their supply chains to consumers, they are deceived into buying products they would not have otherwise and thereby unwittingly supporting slave labor themselves through their product purchases.  Such food conglomerates should be required to make restitution to the consumers they have deceived and to ensure the absence of slave labor in their supply chains going forward.

2.      Defendants are among the largest and most profitable food conglomerates in the United States.  Defendants source their food products from all over the globe.  Among their products, Defendants market and distribute pet foods, including the well-known cat food Iams.  Iams comes in a variety of flavors and styles, many of which include seafood caught from the tropical waters between Thailand and Indonesia.

3.      Defendants works with their Thai partner, Thai Union Frozen Products PCL ("Thai Union"), to import their pet food into the United States.  In the past year, Thai Union has shipped more than 28 million pounds of seafood-based pet food for some of the top brands sold in America, including Iams, according to United States Customs documents.[1]  Thai Union is Thailand's largest seafood company operating as a vertically integrated producer, processor, and exporter of canned seafood and pet food.[2]

4.      Thai Union has controlling stakes in seafood and pet food canneries, including Songkla Canning PCL and Thai Union Manufacturing Co., Ltd.  These canneries receive large shipments of fish from "motherships" which are larger boats that refrigerate and transport fish from numerous fishing boats.

5.      These motherships do not capture fish themselves.  Rather, they go between port and the fishing boats to resupply the fishing boats, pick up caught fish, and deliver the fish to the canneries for processing.  As a result, fishing boats do not need to return to port and can instead continuously fish, ensuring constant productivity with the ultimate goal of higher profits.  And because motherships eliminate the need for fishing boats to return to land for months at a time, the fishing boats operate at great distance from any port and without oversight.

6.      Thus, the supply chain can be depicted as follows:

---

[1] Ian Urbina, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*, New York Times (July 27, 2015) ("*Sea Slaves*"), http://www.nytimes.com/2015/07/27/world/outlaw-ocean-thailand-fishing-sea-slaves-pets.html?_r=0 (last visited Aug.14, 2015).

[2] Thai Union Frozen Food Prods. PCL, Company Profile, http://www.thaiuniongroup.com/en/profile/subsidiaries.ashx (last visited Aug. 14, 2015).

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 2
Case No.:
804613 V1

Mars • P&G

↓

Thai Union Frozen Products

↓

Songkla Canning • Thai Union Mfg.

↓

Motherships

↓

Fishing Boats

7.     Without Defendants holding their supply chain to a higher standard, the deckhands on these fishing boats end up working as modern day slaves, as described in the recent New York Times article, *'Sea Slaves': The Human Misery that Feeds Pets & Livestock*.[3]  Often trafficked from Thailand's poorer neighbors such as Cambodia and Burma, men and boys are sold to fishing boat captains needing crews to man their fishing boats.  The work is dangerous and exhausting with shifts lasting up to 20 hours a day with little or no pay.  Refusal or failure to work to a supervisor's satisfaction can result in being beaten or even murdered.

8.     The Bureau of International Labor Affairs of the United States Department of Labor confirms that fish and shrimp from Thailand are likely the product of forced labor.[4]

| Country | Good | Child Labor | Forced Labor |
|---|---|---|---|
| Thailand | Fish | | X |
| Thailand | Garments | X | X |
| Thailand | Pornography | X | |
| Thailand | Shrimp | X | X |
| Thailand | Sugarcane | X | |

[3] Urbina, *Sea Slaves, supra* note 1.

[4] http://www.dol.gov/ilab/reports/child-labor/list-of-goods/countries/?q=Thailand.

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 3
Case No.:
804613 V1

Likewise, Aidan McQuade, director of Anti-Slavery International, has commented that "[i]f you buy prawns or shrimp from Thailand, you will be buying the product of slave labour."

9.      Knowing that the much of the fish sold in Defendants' pet food is likely the product of slave labor is material to consumers not wishing to support slave labor with their purchasing power.  In the course of marketing and selling its pet foods, however, Defendants materially omit and do not disclose the likelihood that much of the fish in its pet food is the product of slave labor. Furthermore, Defendants do not disclose that despite its awareness that slave labor is being used in its supply chains, Defendants have not required its suppliers to remedy this human tragedy.  Defendants, among the largest companies in the world, can dictate the terms by which seafood is produced and supplied to it, including the labor conditions in the supply chain.  But Defendants are presently not able to trace the fish that it imports back to the fishing boats that source it, much less ensure that the fist is not the product of slave labor. And meanwhile Defendants profit from the slave labor that supplies their fish.  This is shameful.  Had Plaintiffs and Class Members known the truth, they would not have purchased Defendants' pet food or paid as much for them.

10.      Defendants' material omissions and failure to disclose are all the more appalling considering that Defendants have identified the protection of human rights, including the elimination of all forms of forced or compulsory labor, as an integral part of their human rights policies.[5]  But Defendants do not live up to their own ideals. Defendants' public espousal of a message condemning forced labor and their superior knowledge of the likelihood that much of the fish in their pet food is so sourced obligate Defendants to disclose the truth to consumers.

---

[5] Mars.com, Mars Human Rights Policy, http://www.mars.com/global/press-center/human-rights.aspx (last visited Aug. 27, 2015); *see also* Mars Supplier Code of Conduct, Mar. 2014, 4, 12, http://www.sharedservices.mars.com/assets/Mars_S%20C%20of%20C%202014_English_May%2030.pdf (last visited Aug. 27, 2015).

11.     Defendants' conduct described herein violates the (i) California's Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or "UCL"); (ii) California Civil Code §§ 1750, *et seq.* (the Consumers Legal Remedies Act or "CLRA"); and (iii) California's Business & Professions Code §§ 17500, *et seq.* (the False Advertising Law or "FAL").  Plaintiffs brings this action on behalf of a California class for restitution and injunctive relief, and any other relief deemed appropriate by the court to which this case is assigned.

## II.     PARTIES

12.     Plaintiff Christina Wirth is and was at all relevant times a citizen of the State of California, residing in Costa Mesa.  Plaintiff Wirth has purchased Iams cat food from Defendants through various retail stores including Petco and PetSmart in Costa Mesa from 2011 through present.   Plaintiff Wirth saw the product packaging and labeling as well as signage in retail stores where she purchased the cat food.  Mrs. Wirth would not have purchased it or paid as much had Defendants disclosed the truth. Plaintiff seeks restitution and injunctive relief requiring Mars to cease its deceptive marketing.

13.     Plaintiff Adam Wagner is and was at all relevant times a citizen of the State of California, residing in Yucaipa.  Plaintiff Wagner has purchased Iams cat food from Defendants through various retail stores including Stater Bros. in Yucaipa and Wal-Mart in Beaumont from 2013 through present.   Plaintiff Wagner saw the product packaging and labeling as well as signage in retail stores where he purchased the cat food.  Mr. Wagner would not have purchased it or paid as much had Defendants disclosed the truth.   Plaintiff seeks restitution and injunctive relief requiring Mars to cease its deceptive marketing.

14.     Defendant Mars, Inc. is a global food and beverage company which through its subsidiaries manufactures and sells food and beverages, including pet foods.  In August 2014, Mars, Inc. completed its acquisition of Iams Company from

Procter & Gamble Company.  Mars, Inc.'s corporate headquarters are located in Delaware with its main office located at 6885 Elm Street, McLean, Virginia 22101.  It is the parent company of Mars Petcare US, Inc. and the Iams Company.

15.   Defendant Mars Petcare, US Inc. is a nationwide manufacturer and distributor of petfood products.  Its corporate headquarters is located at 100 International Dr, Mt. Olive, NJ 07828.

16.   Defendant Iams Company is a nationwide manufacturer of pet foods.  Its corporate headquarters is located at 8700 S. Mason Montgomery Rd, Mason, OH 45040.

17.   Procter & Gamble Company is a multinational consumer goods company that manufactures products ranging from personal care to cleaning agents.  From September, 1999 until August, 2014, Iams Company was a subsidiary of Procter & Gamble. Its corporate headquarters is located at 1 or 2, Procter & Gamble Plaza, Cincinnati, OH, 45201.

18.   Defendants develop, market, and distribute the Iams cat food line through pet stores, grocery stores, and online in California and nationwide.  Iams products using seafood imported by Thai Union ("Iams") include, but are not limited to, the following: (i) Iams Purrfect Delights Dive in, Oceanfish Dinner Chunks In Gravy; (ii) Sea You Soon Tuna Dinner Chunks In Gravy; (iii) Iams Purrfect Delights Tempt Me Tuna and Mackeral Dinner; (iv) Iams Purrfect Delights Tempt Packed With Sardines Dinner; (v) Iams Purrfect Delights Tuna Topia Dinner; (vi) Iams Purrfect Delicacies Roasted Chicken & Shrimp Dinner in Gravy; (vii) Iams Purrfect Delites Salmon-Dipity Pate In Sauce; (viii) Iams Purrfect Delicacies Select Cuts with Roasted Chicken & Tuna Dinner in Gravy; (ix) Iams Purrfect Delicacies Premier Flaked Mackeral and Whitefish Recipe in Sauce ; (x) Iams Purrfect Delicacies Signature Flaked Tuna and Salmon Recipe in Sauce; (ix) Iams Purrfect Grain Free Saucy Wild Oceanfish & Tuna Dinner.

### III.    JURISDICTION AND VENUE

19.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, and the Class includes members who are citizens of a different state than Defendant.

20.    This Court has personal jurisdiction over Defendants because they have regional offices and conduct substantial business in this district and throughout the State of California.

21.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants have marketed and sold pet food within this district, and a substantial number of the acts and omissions alleged herein occurred within this district.

### IV.    FACTUAL ALLEGATIONS

**A.    Forced Labor Is Used to Produce Iams Cat Food.**

22.    The journey from "bait to plate" for American pet food products spans thousands of miles and involves numerous parties.  Sophisticated entities like Defendants harness their vast resources to efficiently catch fish in far off Southeast Asian waters, process those fish into pet food, and transport that pet food for sale to the American consumer.

23.    This journey begins on fishing trawlers operating in the tropical waters in and around the Gulf of Thailand and the South China Sea near Indonesia.  These fishing trawlers undertake the actual task of capturing the mackerel, tuna, prawns another species of sea life from the ocean that go into canned seafood and pet food.[6]

---

[6]  Urbina, *Sea Slaves*, *supra* note1; Kate Hodal and Chris Kelly, *Trafficked Into Slavery on Thai Trawlers to Catch Food for Prawns*, The Guardian (June 20, 2014), ("*Trafficked Into Slavery"*), http://www.theguardian.com/global-development/2014/jun/10/-sp-migrant-workers-new-life-enslaved-thai-fishing (last visited Aug.14, 2015).

24.     The crews of these fishing trawlers are very often men and boys who have been trafficked from nearby Myanmar and Cambodia.[7]  Desperate and vulnerable, these men and boys fall victim to human traffickers who prey upon their poverty by offering the prospect of employment in Thailand which would enable these people to help their families.  Instead of true employment, men and boys are sold as slaves by brokers and smugglers to fishing captains in Thai ports in need of labor.  Once sold, these men and boys (hereafter "Sea Slaves") enter a modern form of indentured servitude where they are required to work to pay off the price the captains paid to purchase them. The Sea Slaves cannot leave the boats until their debt is paid.  After leaving port, these boats become floating prisons isolated by thousands of miles of open water.

25.     These Sea Slaves are frequently resold to other fishing boats while out at sea, often at higher prices than their price at port.  As a result, Sea Slaves are involuntarily forced into longer and longer periods of servitude as their debt grows and the price of their freedom becomes ever more elusive.  Often, these purchases are made in one of five locations that are the deepest parts of the oceans, the point farthest away from every shore.  Here, the Thai, Indonesian, and Vietnamese jurisdictions intersect, making enforcement and application of laws confusing—to the advantage of companies that rely on slave labor, like Thai Union.

26.     Daily life at sea is harsh by any standard.  Meals for Sea Slaves consist of one bowl of rice per day along with some unwanted fish.[8] When water runs low, Sea Slaves often suck the unsanitary and foul-tasting ice chips used to freeze fish.  Sleeping in two hour shifts, quarters are cramped, hot and filled with rodents and other vermin.  The boats' engines operate constantly emanating a deafening noise and periodically spewing black clouds of toxic fumes into the sleeping quarters.  Sea

---

[7] Urbina, *Sea Slaves*, *supra* note 1; Hodal, *Trafficked Into Slavery, supra* note 6.

[8] Urbina, *Sea Slaves*, *supra* note 1; Hodal, *Trafficked Into Slavery, supra* note 6.

Slaves work in all weather conditions enduring seasickness during rough seas and the unrelenting heat of the tropical sun.  Beyond the boat, pirates are known to operate in the region.

27.    The work on these trawlers is extremely dangerous.[9]  As a preliminary matter, many Sea Slaves do not know how to swim making any misstep potentially fatal.  Moreover, fishing trawlers typically use weighted nets to capture anything that might be swimming along the ocean floor.  Once the nets are raised to the surface, Sea Slaves will jump overboard to ensure that the nets have closed properly.  If a Sea Slave becomes entangled in the mesh nets, he could be forced underwater and drown before anyone would notice.  During rough seas, large waves can pound the fishing trawlers and easily drag away anyone on deck unlucky enough to be in the wrong place at the wrong time.  Nylon lines can sever fingers and open wounds on constantly wet hands.  Deeper cuts are stitched up by Sea Slaves themselves, resulting in large numbers of infections.

28.    Boat captains and officers regularly engage in severe physical punishment of insubordinate Sea Slaves.  Various forms of punishment include physical beatings, solitary confinement in foul smelling fishing holds below deck for days on end, and shackling them by the neck.[10]  In other cases, captains and their officers have been known to kill Sea Slaves.  Sick Sea Slaves have been thrown overboard.  Others have been beheaded.  As overfishing has continued to deplete populations of fish in the South China Sea,[11] Sea Slaves must endure these conditions

[9] Urbina, *Sea Slaves*, *supra* note 1; United Nations Inter-Agency Project on Human Trafficking, *Exploitation of Cambodian Men at Sea: Facts about the Trafficking of Camodian Men onto Thai Fishing Boats* (Apr. 22, 2009) ("*Men at Sea*"), http://www.no-trafficking.org/reports_docs/siren/siren_cb3.pdf.

[10] Urbina, *Sea Slaves*, *supra* note 1; Hodal, *Trafficked Into Slavery, supra* note 6 ; United Nations Inter-Agency Project on Human Trafficking, *Men at Sea*, *supra* note 9.

[11] *See* Environmental Justice Foundation, *Pirates and Slaves: How Overfishing in Thailand Fuels Human Trafficking and the Plundering of Our Oceans* (2015), 10 http://ejfoundation.org/sites/default/files/public/EJF_Pirates_and_Slaves_2015.pdf (last visited Aug.17, 2015).

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 9
Case No.:
804613 V1

for months at a time as fishing trawlers continue to operate further and further from coastlines.  The conditions are so severe that the United Nations has issued a call to action for Cambodian, Thai, and Malaysian governmental agencies to enforce the human rights laws and policies.[12]

29.    On the open ocean, the Sea Slaves are at the mercy of the captain or other officers.[13] Corrupt law enforcement officials are often complicit in the trafficking of sea slaves, while Thai maritime authorities are limited in their ability to patrol thousands of square miles of open water – which is precisely why these boats operate at such distances from coastlines.

30.    Once fish have been caught and stored by fishing trawlers, the boats then meet with so-called "motherships."[14]  Motherships do not fish.  Their purpose is merely to collect the fish from fishing trawlers, store them into their larger and better refrigerated cargo holds, and resupply the fishing boats.  They are vital to the fishing boats' ability to operate further and further from coastlines, away from prying law enforcement and any government authorities.

31.    Motherships do not inquire whether the fishing boat's labor force is comprised of Sea Slaves.  While motherships may meet up with both fishing boats using Sea Slaves and other boats using legitimately employed deckhands, once the fish is collected and stored, fish that is the product of forced labor is mixed with fish that is legitimately caught, making any kind of tracing impossible.[15]  That Defendants permit such mixing of sources in their supply chain renders them unable to assert that *any* fish imported from Thailand is not the product of slave labor.

---

[12] United Nations Inter-Agency Project on Human Trafficking, *Men at Sea*, *supra* note 9.

[13] Urbina, *Sea Slaves*, *supra* note 1; Hodal, *Trafficked Into Slavery, supra* note 6; United Nations Inter-Agency Project on Human Trafficking, *Men at Sea*, *supra* note 9.

[14] Urbina, *Sea Slaves*, *supra* note 1; Hodal, *Trafficked Into Slavery, supra* note 6.

[15] Urbina, *Sea Slaves*, *supra* note 1; Hodal, *Trafficked Into Slavery, supra* note 6.

32. Mothersships then haul their cargo to ports on the Thai coast. At port, the fish are loaded onto trucks bound for nearby canneries in order to be processed into canned pet food and seafood.[16]

33. As reported by the New York Times, one Sea Slave learned that much of the fish on the boat where he was held captive was eventually sent to a cannery owned by Songkla Canning PCL.[17] Songkla Canning PCL and Thai Union Manufacturing LTD are the cannery subsidiaries of Thai Union Frozen Products PCL (hereafter "Thai Union").[18] Thai Union and its subsidiaries process, package, and export many of America's best known pet food brands, including Iams. In the past year, Thai Union has shipped more than 28 million pounds of seafood-based cat and dog food for many of these top brands according to United States Customs documents.[19]

34. After Thai Union's canneries have processed the raw fish into Iams, Thai Union exports it to Defendants in the United States. Thai Union may export directly with Mars as a consignee. Alternatively, Thai Union may export to U.S. Pet Nutrition, LLC, a Thai Union subsidiary in San Diego, California that acts as a consignee to Iams shipments.[20] Likewise, when P&G owned Iams, Thai Union would export Iams with U.S. Pet Nutrition, LLC acting as consignee.

35. Upon arrival in the United States, the Iams cat food enters Defendants' distribution network and is shipped to retailers in California and throughout the United States.

---

[16] Robin McDowell, Margie Mason, Martha Mendoza, *AP Investigation: Are slaves catching the fish you buy?* (Mar. 25, 2015), http://news.yahoo.com/ap-investigation-slaves-catching-fish-buy-011905896--finance.html (last visited Aug. 14, 2015).

[17] Urbina, *Sea Slaves*, *supra* note 1.

[18] Thai Union Frozen Food Prods. PCL, *supra* note 2.

[19] Urbina, *Sea Slaves*, *supra* note 1.

[20] U.S. Pet Nutrition, Company Homepage, http://uspetnutrition.com/ (last visited Aug. 25, 2015); *see also* Bloomberg, Company Overview of US Pet Nutrition, LLC, http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=130721077 (last visited Aug. 25, 2015).

1

**B.      Defendants Fail to Disclose the Use of Slave Labor in Their Supply Chain.**

2

36.      While Iams packaging states that it is a product of Thailand, a consumer

3

reviewing the Iams packaging will find no mention of the likelihood that forced labor

4

was used to catch the seafood going into the product.



**FIGURE 1: (FRONT)**



**FIGURE 2: (BACK SHOWING MADE IN THAILAND)**

1
2
3
4
5
6
7
8
9
10
11
12
13



**FIGURE 3: (FRONT)**

14
15
16
17
18
19
20
21
22
23
24
25
26
27



**FIGURE 4: (BACK SHOWING MADE IN THAILAND)**

28

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 13
Case No.:
804613 V1

1
2
3
4
5
6
7
8
9
10
11
12



**FIGURE 5: (FRONT)**

13
14
15
16
17
18
19
20
21
22
23
24



**FIGURE 6: (BACK SHOWING MADE IN THAILAND)**

25
26      37.    Nowhere on the packaging for any of the Iams cat food products is there
27   any indication of the slave labor conditions of those people catching the fish that go
28

into them.

38.     Similarly, Defendants' websites do not disclose the likelihood of slave labor in the Iams supply chain, despite their superior knowledge, as compared to consumers, regarding that supply chain.

**C.    Defendants Recognize that the Use of Slave Labor in Their Supply Chains Is Wrong.**

39.     Mars' corporate business principles explicitly identify "Freedom" as one of its Five Principles. Mars represents that its Five Principles are the foundation of its Human Rights Policy, which states, "In accordance with the UN Guiding Principles [on Business and Human Rights], we will implement a due diligence process to identify, mitigate and prevent adverse impacts on human rights and appropriate mechanisms for remediation. No matter where we operate, Mars strives to comply with the spirit and the letter of the law."[21]   In describing the relationship with Mars' suppliers, the Human Rights Policy also states that the Mars Supplier Code of Conduct (the "Supplier Code") "sets our global expectations prohibiting the use of child labour in accordance with ILO Minimum Age Convention No. 138 and in the areas of health and safety, the environment and ethical business practices."

40.     For example, in the Supplier Code, Mars states that in order to do business with Mars, "Supplier confirms that it complies with the legal requirements and standards of its industry and…[i]f the Code establishes a higher standard than is required by applicable law, Mars expects its suppliers to align with the principles contained in the Code." [22]   Mars further warns that it "reserves the right to conduct announced and unannounced on-site independent third-party audits of Supplier's facilities."

41.     The Supplier Code further states that a "Supplier employs all employees on a voluntary basis and does not use any prison, slave, bonded, forced or indentured

---

[21] Mars.com, Human Rights Policy, *supra* note 5.

[22] Mars Supplier Code of Conduct, *supra* note 5 at 2.

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 15
Case No.:
804613 V1

labor…or any other forms of slavery or human trafficking."[23] Moreover, Mars' Code demands that a "Supplier does not use or source raw materials or products associated with forced labor or human trafficking."[24] Suppliers are not allowed to require children to work under hazardous conditions, for periods exceeding eight hours per day, or in a "manner that unreasonably interferes with vocational education."[25] As alleged above, all of these practices occur in Mars' Iams supply chain.

42. Additionally, Mars' Supplier Code of Conduct demands that suppliers are capable of "disclos[ing] the geographical location of facilities producing raw materials for Mars, as well as the origin of raw materials within the suppliers own direct supply chain. Supplier will take responsibility to implement the requirements of this Code and associated due diligence processes with those in its own direct supply chain."[26] While Mars claims that between 80% and 85% of its Tier 1 suppliers[27] will have completed Mars' responsible sourcing requirements by the end of 2015,[28] it makes no such claim as to its Tier 2 suppliers, which supply the Tier 1 suppliers.[29] As alleged above, because Mars permits its sources to store, transport, and process fish caught by Sea Slaves alongside fish caught by legitimate fishing operators, Mars is not able to trace its Iams cat food back to the source and Mars knew or should have known that the due diligence obligations under the Supplier Code could not be satisfied.

---

[23] *Id.* at 4, 12.

[24] *Id*. at 4.

[25] *Id*. at 3.

[26] *Id*. at 13.

[27] Tier 1 suppliers are those suppliers, both direct and indirect, who provide us with goods and services. *See* Mars.com, Who Is Impacted?, http://www.mars.com/global/about-mars/responsible-sourcing/who-is-impacted.aspx (last visited Aug. 27, 2015).

[28] Mars.com, Targets and Progress, http://www.mars.com/global/about-mars/responsible-sourcing/target-status-progress.aspx (last visited Aug. 27, 2015).

[29] Tier 2 suppliers are the suppliers of Tier 1 suppliers. *See* Mars.com, Who Is Impacted?, *supra* note 27.

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 16
Case No.:
804613 V1

43.     In its Worldwide Business Conduct Manual ("WBCM"), effective November 1, 2010, P&G states right on its cover that "We Do the Right Thing."[30]  As part of this grand statement, the WBCM gives notice that "[P&G] also expect[s] suppliers and other business partners to comply with the…WBCM."[31]  The WBCM squarely addresses P&G's position on the use of slave labor stating, "[w]e do not use child or forced labor in any of our global operations or facilities. None of us should tolerate any form of unacceptable treatment of workers in our operations or facilities. This means, among other things, that we do not permit exploitation of children, physical punishment or abuse, or involuntary servitude."[32]  The WBCM also discusses violence in the workplace. "As part of our commitment to providing a safe work environment, we never…tolerate any form of violence.  At P&G, 'violence' includes threats or acts of violence, intimidation of others or attempts to instill fear in others. Weapons are not allowed in the workplace, consistent with local law."[33]  Moreover, P&G employees "must immediately report [their] concerns" if they know of or suspect incidents or threats of violence.[34]

44.     In addition to P&G's position that its WBCM applies to its suppliers and business partners, P&G also provides "Sustainability Guidelines for External Business Partners."  Again, P&G emphasizes that "the principle of doing the right thing" is the basis for how P&G and its suppliers should operate.[35]  P&G declares that it seeks to "operate within the spirit and letter of the law…[and] actively seek[s] business

---

[30] *See* Procter & Gamble, Our Worldwide Business Conduct Manual, Effective Nov. 2010, http://www.pg.com/en_US/downloads/company/governance/Policy_Worldwide_Business_Conduct_Manual.pdf (last visited Aug. 28, 2015).

[31] *See id.* at 1.

[32] *See id.* at 10.

[33] *See id.* at 11.

[34] *See id.* at 11.

[35] PGSupplier.com, Sustainability Guidelines for External Business Partners, http://www.pgsupplier.com/en/pg-values/sustainability.shtml (last visited Aug. 28, 2015).

relationships with partners who share our values."  P&G warns that it "reserves the right to conduct audits to assure compliance with these guidelines and also reserves the right to discontinue any relationship should the external business partner violate…these guidelines."[36]

45.    Under the heading "Human Rights," P&G states:

> P&G respects internationally recognized human rights as defined by the Universal Declaration of Human Rights and Associated Covenants, and the International Labor Organization (ILO) Declaration on the Fundamental Principles and Rights at Work. We expect our external business partners to respect these internationally recognized human rights.  In our business award decisions, we will continue to place substantial value upon incumbent and potential external business partners who consistently respect these human rights.[37]

Accordingly, P&G formally represents to the public that in choosing suppliers, P&G will seek out partners that respect internationally recognized human rights.

46.    For example, P&G declares that "[e]xternal business partners…must not use…indentured or bonded labor, human trafficking, or modern day slavery.  External business partners must never use corporal punishment or other forms of mental and/or physical coercion."[38]  And "P&G's external business partners will not use child labor."[39]

47.    Knowing that consumers are concerned about human rights, P&G's Human Rights Policy Statement is designed to reassure the public that purchasing P&G products is a responsible choice.  Under the heading "Respecting Our Consumers," P&G notes that its purpose 'to provide branded products and services of superior quality and value that improve the lives of the world's consumers, now and for generations to come' inspires everything [P&G does] and inspires our human

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

rights policy."[40]  Moreover, P&G assures its consumers that "[w]e respect the human rights of all persons in the communities in which we conduct business as well as recognize that we must be responsible for environmental stewardship and using resources wisely."[41]  P&G describes itself as "particularly committed to improving the lives of children in need around the world" and purports to engage human rights advocates to explore how "make progress" on human rights issues.[42]

48.     As alleged above, because P&G permitted its sources to store, transport, and process fish caught by Sea Slaves alongside fish caught by legitimate fishing operators, P&G was not able to trace its Iams cat food back to the source.  P&G knew or should have known that it failed to ensure the absence of forced labor in the sourcing of its Iams cat food in violation of its own WBCM, Sustainability Guidelines for External Business Partners, and Human Rights Policy Statement.

49.     While Defendants take great pains to articulate their focus on human rights, they avoid mentioning that by sourcing from countries like Thailand, Defendants source from a country that has been identified by the U.S. State Department as a "Tier 3 source, destination, and transite country for men, women, and children subjected to forced labor and sex trafficking" with particular reference made to the fishing industry.[43]

50.     In summary, although Defendants recognize that the use of slave labor in their supply chain is wrong and their corporate business principles explicitly forbid slave labor by their suppliers, they materially omit to disclose to consumers

---

[40] PG.com, P&G Human Rights Policy Statement, 3 http://www.pg.com/en_US/downloads/sustainability/reports/PG_HumanRightsPolicyS tatement.pdf (last visited Aug. 31, 2015).

[41] *Id*.

[42] *Id*. at 3-4.

[43] *See* U.S. Dep't of State, Office to Monitor & Combat Trafficking in Persons, *2014 Trafficking in Persons Report*, http://www.state.gov/j/tip/rls/tiprpt/countries/2014/226832.htm (last visited Aug. 17, 2015). Other countries ranked as Tier 3 for forced labor include North Korea and Iran. U.S. Dep't of State, Office to Monitor & Combat Trafficking in Persons, *id*.

purchasing Iams the likelihood that slave labor was used to source the seafood making up the product.

**D.      Use of Slave Labor in the Iams Supply Chain Is Material to Consumers.**

51.     Consumers have become sensitive to the human cost behind the products that they buy.  This sensitivity transcends industries and ranges from products as diverse as clothing to coffee.

52.     A 2006 study by researchers at the University of Michigan analyzed consumer purchases to determining consumer willingness to pay a premium for athletic socks marked with a Good Working Conditions ("GWC") label.[44]  The study concluded that 30% of consumers in a working class neighborhood of Detroit were willing to pay a 20% price premium (from $1.00 to $1.20) for GWC labeled socks compared to non-GWC labeled socks.[45]

53.     A 2011 study lead by researchers at Harvard University studied consumer willingness to pay a premium for polo shirts sold with an SA8000 certification on eBay.[46]  The SA8000 certification prohibits the use of child labor and forced labor and discrimination based on race, gender, and religion.  The code mandates that workers be allowed to organize and bargain collectively with their employers.  The SA8000 code also requires that workplaces satisfy minimum health and safety standards, pay minimum (living) wages, and that overtime work is voluntary, limited, and paid at a premium.[47]  "On average, shoppers paid a 45% premium for labeled versus unlabeled

---

[44] Howard Kimeldorf, Rachel Meyers, Monica Prasad, & Ian Robinson, *Consumers with a Conscience: Will They Pay More?* (Winter 2006), 24 *available at* http://www.npr.org/documents/2013/may/consumer_conscience_study_ME_20130501.pdf (last visited Aug. 17, 2015).

[45] *Id.*

[46] Michael J. Hiscox, Michael Broukhim, Claire S. Litwin. Andrea Woloski, *Consumer Demand For Fair Labor Standards: Evidence From a Field Experiment on eBay* (Apr. 2011), 3 http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1811788 (last visited Aug. 17, 2015).

[47] *Id.*, (citing http://www.sa-intl.org/_data/n_0001/resources/live/2008StdEnglishFinal.pdf) (last visited Aug. 17, 2015).

shirts.  The findings suggest that there is substantial consumer support for fair labor standards, even among price-sensitive eBay shoppers."[48]

54.     Another Harvard University study led by a similar team studied consumer willingness to pay a premium for coffee certified as Fair Trade on eBay.[49]  A Fair Trade certification requires, amongst other things, that the producer not use forced and child labor in the production of its coffee.[50]  The study found that consumers in online auctions were willing to pay an average of 23% more for coffee certified as Fair Trade.[51]

55.     Similar to products like socks and coffee, pet food is an inexpensive good generally imported from foreign countries where labor costs are considerably cheaper. Accordingly, consumers are similarly sensitive to slave labor being used in pet food production.

56.     A survey by FishWise, a non-profit marine conservation organization, further explains the depths of consumer concerns regarding human rights abuses in supply chains.  FishWise surveyed consumers, the seafood industry and non-governmental organizations.[52]  Eighty-eight percent of consumers stated that they would stop buying a product if it was associated with human rights abuses.[53]  The survey further revealed that 70% percent of consumers would pay more for a product certified to be free of human rights abuses.[54]  FishWise noted that, "survey results

---

[48] *Id*. at 3, 22.

[49] *See* Michael J. Hiscox, Michael Broukhim,& Claire S. Litwin, *Consumer Demand for Fair Trade: New Evidence From A Field Experiment Using eBay Auctions of Fresh Roasted Coffee* (Mar. 16, 2011), http://scholar.harvard.edu/files/hiscox/files/consumerdemandfairlaborstandardsevidencecoffee.pdf (last visited Aug. 17, 2015).

[50] *Id*. at 4.

[51] *Id*. at 3, 23.

[52] FishWise, *Trafficked II: An updated summary of human rights abuses in the seafood industry* (2014), at p. 5, available at http://www.fishwise.org/services/human-rights.

[53] *Id*. at 6.

[54] *Id*.

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 21
Case No.:
804613 V1

indicate that human rights are important to seafood consumers and many of them are willing to avoid high risk products and pay more for those that are certified to be free of abuses."[55]

57.     Defendants are well aware of this consumer sensitivity and mounted their extensive public relations effort to position themselves as companies invested in eradicating slavery from their supply chain.  Their hollow statements mask a tragic truth that keeps thousands of impoverished men and boys trapped on the open sea with little or no hope of ever returning home.  Had consumers known the truth, they would not have purchased or paid as much for Iams.

## V.     CLASS ACTION ALLEGATIONS

58.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a Class defined as follows:

> All consumers who purchased seafood based Iams cat food in California during the four years prior to the filing of the complaint.

59.     Excluded from the Class are Defendants; the officers, directors or employees of Defendants; any entity in which Defendants has a controlling interest; and any affiliate, legal representative, heir or assign of Defendants.  Also, excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

60.     Plaintiffs do not know the exact number of Class Members at the present time.  However, due to the nature of the trade and commerce involved, there appear to be thousands of Class Members such that joinder of all Class members is impracticable.

61.     The Class is ascertainable by objective criteria permitting self-identification in response to notice, and notice can be provided through techniques

---

[55] *Id*. at 7.

similar to those customarily used in other consumer fraud cases and complex class actions, and through Defendants' business records.

62.     There are questions of law and fact common to the Class.  Defendants' unlawful omissions similarly impact Class Members, all of who purchased one or more Iams cat food products.

63.     Plaintiffs assert claims that are typical of the Class.  Plaintiffs and all Class Members have been subjected to the same wrongful conduct because they all have purchased Iams cat food that was not disclosed as likely sourced from suppliers using forced labor.  As a result, and like other members of the Class, Plaintiffs purchased and paid an amount for Iams cat food products which he otherwise would not have paid.

64.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs are represented by counsel competent and experienced in both consumer protection and class action litigation.

65.     Class certification is appropriate because Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

66.     Class certification is also appropriate because common questions of law and fact substantially predominate over any questions that may affect only individual members of the Class, including, *inter alia*, the following:

      a.     Whether Defendants failed to disclose the likelihood that Sea Slaves were used in its Iams supply chain;

      b.     Whether the likelihood that Sea Slaves were used in Defendants' Iams supply chain would be material to a reasonable consumer;

      c.     Whether Defendants had a duty to disclose the likelihood that Sea Slaves were used in its Iams supply chain;

      d.     Whether Defendants' nondisclosures were likely to deceive a reasonable consumer;

      e.     Whether Defendants' conduct violates the UCL, FAL

and CLRA;

f.   Whether the challenged practices harmed Plaintiffs and members of the Class; and

g.   Whether Plaintiffs and members of the Class are entitled to restitutionary, injunctive, or other relief.

67.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class Members is impracticable.  Furthermore, because the restitution and/or damages suffered, and continue to be suffered, by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

68.   The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

69.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

70.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."  Defendant have engaged in unlawful, and unfair, and fraudulent business acts and practices in violation of the UCL.

71.   Defendants have violated the unlawful prong by virtue of its violations of the CLRA, as described below.

72.     Defendants have violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint offend established public policies against the use of slave labor and the sale of products tainted by the use of slave labor and supporting truth in advertising to consumers.  Defendants' participation in a supply chain involving slave labor is immoral, unethical, oppressive, unscrupulous and injurious to consumers.  The harm that these acts and practices cause greatly outweighs any benefits associated with them.  Defendants' conduct also impairs competition within the market for pet food, and prevents Plaintiffs and Class Members from making fully informed decisions about the kind of pet food to purchase or the price to pay for such products.

73.     Defendants have violated the fraudulent prong of section 17200 because, as set forth above, its material omissions were likely to deceive a reasonable consumer and the true facts would be material to a reasonable consumer.

74.     Defendants had a duty to disclose the likelihood of forced labor in their supply chain, arising from (1) their superior knowledge of Defendants' supply chain and the practices of its suppliers as compared to consumers, *e.g.* through Defendants' years of experience marketing and distributing seafood-based pet food manufactured in Thailand; and (2) their partial representations and/or misrepresentations to the contrary, *e.g.,* numerous corporate statements intended to show that Defendants do not tolerate use of forced labor by its suppliers.

75.     As alleged herein, Defendants failed to disclose the likelihood of slave labor in their supply chain for Iams.  Nor do Defendants disclose that despite their awareness of slave labor in the Iams supply chain, they have not required their suppliers to remedy the ongoing human rights abuses.

76.     These omissions would be material to a reasonable consumer.

77.     Reasonable consumers are likely to be deceived by Defendants' material omissions.

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 25
Case No.:
804613 V1

78.     Plaintiffs have suffered injury in fact, including the loss of money, as a result of Defendants' unlawful, unfair, and/or deceptive practices.  Plaintiffs and members of the Class were directly and proximately injured by Defendants' conduct and lost money as a result of Defendants' material omissions, because they would not have purchased nor paid as much for Iams had they known the truth.

79.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California.

80.     Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair and deceptive business practices, to restore to Plaintiffs and members of the Class any money that Defendant acquired by unfair competition, and to provide such other relief as set forth below.

81.     Plaintiffs are entitled to an award of reasonable attorneys' fees under California Code of Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *ET SEQ.*)

82.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

83.     Defendants are "persons" under Cal. Civ. Code § 1761(c).

84.     Plaintiffs and Class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased Defendants' Iams.

85.     Cal. Civ. Code § 1770(a)(2) prohibits "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

86.     Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or

services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have….”

87.     Cal. Civ. Code § 1770(a)(7) prohibits “[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.”

88.     Defendants violated these provisions of the CLRA by misrepresenting the source, characteristics, and standard of Iams cat food in omitting disclosure of material aspects thereof.

89.     As alleged herein, Defendants failed to disclose the likelihood of slave labor in their supply chain for Iams.  Nor do Defendants disclose that despite their awareness of slave labor in the Iams supply chain, they have not required their suppliers to remedy the ongoing human rights abuses.

90.     These omissions would be material to a reasonable consumer.

91.     Reasonable consumers are likely to be deceived by Defendants’ material omissions.

92.     Plaintiffs and members of the Class were directly and proximately injured by Defendants’ conduct and lost money as a result of Defendants’ material omissions, because they would not have purchased nor paid as much for Iams had they known the truth.

93.     In accordance with Civil Code § 1780 (a), Plaintiffs and Class Members seek restitutionary, injunctive and equitable relief for Defendants’ violations of the CLRA.  Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief, including attorneys’ fees and costs, as provided in Civil Code § 1780 and the Prayer for Relief.  In addition, after mailing appropriate notice and demand in accordance with Civil Code § 1782(a) & (d), Plaintiffs will amend this Class Action Complaint to

include a request for damages.

94.    Plaintiffs include an affidavit with this Complaint reflecting that venue in this District is proper, to the extent such an affidavit is required by Cal. Civ. Code § 1780(d) in federal court.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE FALSE ADVERTSING LAW
(CAL. BUS. & PROF CODE §§ 17500, *ET SEQ.*)

95.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

96.    California Business & Professions Code §§ 17500, *et seq.* (the "FAL") broadly proscribes deceptive advertising in this State.  Section 17500 makes it unlawful for any corporation intending to sell products or perform services to make any statement in advertising those products or services concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or not to sell those products or services as advertised at the price stated therein, or as so advertised.

97.    When the seller has a duty to disclose material facts about a product, the sale of the product to consumers without disclosure of such material facts runs afoul of the FAL.

98.    As alleged herein, Defendants failed to disclose the likelihood of slave labor in their supply chain for Iams.  Nor do Defendants disclose that despite their awareness of slave labor in the Iams supply chain, they have not required their suppliers to remedy the ongoing human rights abuses.

99.    Defendants had a duty to disclose the likelihood of forced labor in their supply chain, arising from (1) their superior knowledge of Defendants' supply chain and the practices of their suppliers as compared to consumers, *e.g.* through Defendants' years of experience marketing and distributing seafood-based pet food

manufactured in Thailand; and (2) their partial representations and/or misrepresentations to the contrary, *e.g.,* numerous corporate statements intended to show that Defendants do not tolerate use of forced labor by its suppliers.

100. These omissions would be material to a reasonable consumer.

101. Reasonable consumers are likely to be deceived by Defendants' material omissions.

102. Defendants know or reasonably should know that the marketing and sale of its Iams was and is deceptive.

103. Plaintiffs have suffered injury in fact, including the loss of money, as a result of Defendants' unlawful, unfair, and/or deceptive practices. Plaintiffs and members of the Class were directly and proximately injured by Defendants' conduct and lost money as a result of Defendants' material omissions, because they would not have purchased nor paid as much for Iams had they known the truth.

104. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of California.

105. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its deceptive advertising, to restore to Plaintiffs and members of the Class any money that Defendant unlawfully acquired, and to provide such other relief as set forth below.

106. Plaintiffs are entitled to an award of reasonable attorneys' fees under California Code of Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly

situated, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs, and grant the following relief:

A.      Determine that this action may be maintained as a class action with respect to the Class identified herein and certify it as such under Rules 23(b)(2) and/or 23(b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      Declare, adjudge and decree the conduct of Defendants as alleged herein to be unlawful, unfair and/or deceptive;

C.      Enjoin Defendants from continuing the unfair and deceptive marketing and sale of its Iams;

D.      Award Plaintiffs and the Class restitution of all monies paid to Defendants as a result of its unfair and deceptive business practices;

E.      Award Plaintiffs and the Class reasonable attorneys' fees, costs, and pre- and post-judgment interest; and

F.      Award Plaintiffs and the Class such other further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs, by counsel, request a trial by jury for all claims so triable.

COMPLAINT FOR VIOLATION OF CALIFORNIA
CONSUMER PROTECTION LAWS - 30
Case No.:
804613 V1

1

2     DATED: September 10, 2015          HAGENS BERMAN SOBOL SHAPIRO LLP

3                                        By: */s/ Elaine T. Byszewski*
                                         _____
4                                        Elaine T. Byszewski (SBN 222304)
                                         Christopher R. Pitoun (SBN 290235)
5                                        301 N. Lake Avenue, Suite 203
                                         Pasadena, CA 91101
6                                        Telephone: (213) 330-7150
                                         *elaine@hbsslaw.com*
7                                        *christopherp@hbsslaw.com*

8                                        Steve W. Berman (*pro hac vice*)
                                         Ashley A. Bede (*pro hac vice*)
9                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1918 Eighth Avenue, Suite 3300
10                                       Seattle, WA 98101
                                         Telephone: (206) 623-7292
11                                       *steve@hbsslaw.com*
                                         *ashleyb@hbsslaw.com*

12                                       *Attorneys for Plaintiffs and the Proposed Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION RE: CLRA VENUE**

I, Christina Wirth, do hereby declare and state as follows:

       1.      I am a party plaintiff in the above captioned action.  Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).  I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

       2.      This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because defendants in the above captioned case do business throughout the State of California.

       This declaration is signed under penalty of perjury under the laws of the State of California this 9th day of September 2015.

_____

Christina Wirth

1

**DECLARATION RE: CLRA VENUE**

2        I, Adam Wagner, do hereby declare and state as follows:

3        1.        I am a party plaintiff in the above captioned action.  Pursuant to Cal. Civ. Code §

4    1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for

5    relief under Cal. Civ. Code § 1780(a).  I have personal knowledge of the facts stated herein and, if

6    necessary, could competently testify thereto.

7        2.        This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county

8    that is a proper place for trial of this action because defendants in the above captioned case do

9    business throughout the State of California.

10       This declaration is signed under penalty of perjury under the laws of the State of California

11   this **31** day of August 2015.

12

13                                              _____

14                                                   Adam Wagner

15

16

17

18

19

20

21

22

23

24

25

26

27

28

804442 V1